***********
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award based on the record of the proceedings before the Deputy Commissioner and the briefs and oral arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence, and having reviewed the competent evidence of record, the Full Commission hereby AFFIRMS in part and REVERSES in part the Opinion and Award of Deputy Commissioner Glenn.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over the parties and this claim.
2. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. The employer-employee relationship existed between defendants and plaintiff at all relevant times herein.
4. The PMA Group was the carrier on risk providing workers' compensation insurance for defendants at all relevant times herein.
5. Plaintiff's average weekly wage as determined from the Form 22 provided by defendants was $559.61, yielding a compensation rate of $373.09.
6. The following exhibits were stipulated into evidence by the parties at the hearing before Deputy Commissioner Glenn:
Stipulated Exhibit 1 — plaintiff's medical records
Stipulated Exhibit 2 — Form 22
7. The following exhibits were entered into evidence at the hearing before Deputy Commissioner Glenn:
Plaintiff's Exhibit 1 — material safety data sheet for DXR
Plaintiff's Exhibit 2 — material safety data sheet for DAR
8. The issues to be determined by the Commission are as follows:
9. Whether plaintiff developed an occupational disease as a result of his employment with defendants?
10. If so, what, if any, benefits is plaintiff entitled to receive under the North Carolina Workers Compensation Act?
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before Deputy Commissioner Glenn, plaintiff was sixty-two years old. Plaintiff completed the eleventh grade.
2. Plaintiff was hired by defendants on August 14, 1989 as an order selector in their warehouse, where he worked for three months and then was transferred to damage control for three months before he went to work in the body shop. In the body shop his job included repair and painting of tractor-trailers. Plaintiff's job involved grinding, sawing and replacing fiberglass, gluing fiberglass with resin and hardeners, spray painting using a spray gun and air compressor, mixing paints that contained the acrylic enamels DXR and DAR.
3. The body shop where plaintiff worked was approximately 14' by 70' without any windows, and the doors to the shop were normally closed to contain the paint spray and fumes. The shop had two 12 to 14 inch exhaust fans that did not operate properly.
4. Plaintiff was exposed to toxic fumes from the chemicals when he used the glue and resin to repair the fiberglass in the tractor-trailers. The fumes were worse when plaintiff used a heat gun to help cure the fiberglass resin. Plaintiff was provided a charcoal filter respiratory mask, which was a non-positive air system, to wear while he performed his job. Plaintiff did not always wear the respirator.
5. Plaintiff estimated that seventy-five percent (75%) of his time was spent repairing the vehicles and twenty-five percent (25%) was spent painting the vehicles.
6. Plaintiff began to develop symptoms of shortness of breath, severe headaches, memory loss, nausea and anxiety as a result of his exposure to the various chemical compounds and fumes while working for defendants. Plaintiff attributed his symptoms to his exposure to paint and chemicals.
7. After defendants closed the body shop in approximately 1995, plaintiff became a mechanic for the trucks. The mechanic position required plaintiff to reline brakes, grease and perform preventative maintenance on the trailers. Plaintiff worked in a four bay maintenance garage that contained one large center exhaust fan. During the summer months the garage bay doors were left open for ventilation; however, in the winter the doors remained closed to conserve heat. In order to repair the tractors, many times the engines were left running causing the accumulation of diesel fumes. Additionally, plaintiff was exposed to ether, spray paint, oils and other chemicals used in the repair shop.
8. Plaintiff complained to his supervisor about his headaches, breathing problems and memory problems which plaintiff's supervisor, Joseph Moffitt, confirmed in his testimony. Mr. Moffitt, Wayne Maynard and Van Draper testified that there was a large amount of fumes in the body shop and garage areas while plaintiff was working.
9. Plaintiff smoked a pack of cigarettes a day from age 15 to age 35. When he stopped smoking at his doctor's recommendation, his symptoms improved.
10. Plaintiff was seen and treated by Dr. Sean Maloney on October 30, 1996, with complaints of severe headaches and difficulty breathing. Plaintiff told Dr. Maloney that he felt the chemicals used at work were causing his breathing problems. Plaintiff also told Dr. Maloney that he first started having breathing problems while working in the body shop but continued to have them after moving into the garage area.
11. In December 1996, plaintiff was seen and treated by Dr. Charles O'Cain. Dr. O'Cain noted that plaintiff experienced shortness of breath over the last 2 to 5 years, and that plaintiff was concerned that it was caused by the fumes and chemicals from his work.
12. Plaintiff consulted with Dr. Terence McGhee on June 17, 1997. Plaintiff told Dr. McGhee the problems he was having and that he thought the chemicals from work caused them. Dr. McGhee noted improvement in plaintiff condition after treating him with medication but he did not give an opinion on whether plaintiff's problems were caused by his job with defendants.
13. Plaintiff was next seen and treated by Dr. Dennis Darcey of the Duke Medical Center Occupational Medicine Consultation Service on October 31, 1997. Dr. Darcey noted that he sees on a regular basis, the kinds of problems that plaintiff was having and based upon the history plaintiff provided, it was his opinion that plaintiff's condition was caused by his job.
14. Dr. Darcey felt plaintiff was placed at an increased risk of developing his symptoms as a result of his employment with defendants. Dr. Darcey diagnosed plaintiff's condition as reactive airway disease/asthma.
15. Dr. Darcey felt that plaintiff would not be able to continue to work in the area where he was working and needed to be removed to an area in which he would not be exposed to the chemicals causing this reaction. Dr. Darcey indicated that plaintiff would now react to much lower levels of chemicals than he would have prior to his development of reactive airway disease.
16. Dr. Darcey advised plaintiff to avoid exposure to fumes, including chemical irritants, isocyanates, fiberglass resins and amines. He did not advise plaintiff not to return to work with employer. Dr. Darcy recommended plaintiff use an inhaled bronchodilator and an inhaled steroid to improve his symptoms.
17. Dr. Darcey did not find that plaintiff's headaches were related to his exposure of chemicals at work.
18. The Full Commission finds the greater weight of the medical evidence indicates that plaintiff's chemical exposure while employed by defendants was a significant contributing factor in the development of plaintiff's reactive airway disease.
19. Plaintiff's employment with defendant-employer placed him at an increased risk of contracting reactive airways disease as compared to members of the general public not so employed.
20. Plaintiff left his employment on December 18, 1998 without indicating he was leaving for medical reasons. However, plaintiff testified that he quit because he was "just to the point I couldn't continue" due to breathing problems, severe headaches and memory loss.
21. Plaintiff was not taken out of work by any doctor for medical reasons.
22. Plaintiff testified he made no effort to seek employment and has not been employed since 1998.
23. Plaintiff began receiving Social Security disability payments in June of 1999.
24. Plaintiff failed to meet his burden of proving a disability resulted from his occupational disease or that he was unable to work in some capacity.
 *********** CONCLUSIONS OF LAW
1. Plaintiff's contraction of reactive airways disease was due to causes and conditions characteristic of and peculiar to plaintiff's employment, is not an ordinary disease of life to which the general public not so employed is equally exposed, and is, therefore, a compensable occupational disease. N.C. Gen. Stat. § 97-53(13); Bookerv. Medical Center, 297 N.C. 458, 256 S.E.2d 189 (1979).
2. Because plaintiff's claim for reactive airways disease was not accepted as compensable, no presumption of disability arises in favor of plaintiff. Hilliard v. Apex Cabinet Co., 305 N.C. 593, 290 S.E.2d 682
(1982); Sims v. Charmes/Arby's Roast Beef, 142 N.C. App. 154,542 S.E.2d 277, disc. rev. denied, 353 N.C. 729, 550 S.E.2d 782 (2001). An employee may prove disability by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury or occupational disease, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v. Perdue Farms, Inc., 143 N.C. App. 259, 545 S.E.2d 485,aff'd per curiam, 354 N.C. 355, 554 S.E.2d 337 (2001); Russell v. LowesProduct Distribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993). When a plaintiff meets his burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demeryv. Perdue Farms, Inc., supra.
3. Although plaintiff contracted a compensable occupational disease, the greater weight of the evidence fails to show that he sustained any disability as a result of the contraction of the occupational disease. No physician took plaintiff out of work. There is no medical evidence of record that plaintiff was unable to work due to his occupational disease. Plaintiff failed to make reasonable efforts to seek employment after he resigned.
4. Plaintiff failed to prove by the greater weight of the evidence that he is disabled and therefore he is not entitled to disability compensation under the North Carolina Workers' Compensation Act. N.C. Gen. Stat. §§ 97-2(9); -54.
5. Plaintiff is entitled to have defendants provide all medical treatment arising from his compensable occupational disease to the extent it tends to effect a cure, give relief, or lessen plaintiff's disability. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Under the law, plaintiff's claim for disability compensation must be, and the same is hereby, DENIED.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of his occupational disease.
3. Defendants shall pay the costs.
This the ___ day of July 2003.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/_____________ THOMAS J. BOLCH COMMISSIONER
LKM/kjd